UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| FLAME R. AUSTIN-RIDLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:06-CV-182 |
| | ) | |
| GEORGE PABEY and | ) | |
| CHARLES PACURAR, individually and | ) | |
| in their official capacities as Mayor and | ) | |
| City Controller of the City of East Chicago, | ) | |
| Indiana, respectively, and the CITY OF | ) | |
| EAST CHICAGO, INDIANA, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Flame Austin-Ridle was the supervisor of East Chicago's school crossing guards until,

one week into the tenure of newly elected mayor George Pabey, she was fired.  Pabey told

Austin-Ridle's manager that he wanted the position eliminated – and yet, three months later, one

of Pabey's political supporters was hired to do the same job, at twice the salary.  Austin-Ridle

argues that she was fired to make room for a political friend of the mayor's.  But as unpalatable

as cronyism may be, it does not offend the First Amendment unless Austin-Ridle's termination

was somehow connected to her freedom of affiliation or expression.  The undisputed evidence in

this case shows that Pabey did not know who occupied the crossing guard supervisor position

when he eliminated it.  In fact, he did not even know who Flame Austin-Ridle was, let alone who

she supported in the mayoral race.  And Plaintiff's political affiliation aside, there is simply no

evidence to show that Pabey wanted that position cleared out to make room for his political ally.

Under these circumstances, Plaintiff cannot raise a genuine issue of fact on her First Amendment

claim.  She has also failed to make a *prima facie* case of racial discrimination because she has not attempted to show that other similarly situated persons not in her protected class were treated differently from her.[1]  Therefore, Defendants' Motion for Summary Judgment (DE 20) is granted.

## I. FACTUAL BACKGROUND

### A. The 2003-2004 Elections

In May 2003, George Pabey ran against incumbent mayor Robert Pastrick in the Democratic primary for mayor of East Chicago.  (Answer ¶ 4.)  Pastrick defeated Pabey in this primary, but due to voting fraud, the Indiana Supreme Court subsequently voided the primary election result.  (*Id.*); *Pabey v. Pastrick*, 816 N.E.2d 1138 (Ind. 2004).  Pabey then defeated Pastrick in a special election held in October 2004, and subsequently won the special general mayoral election in December 2004.  (Answer ¶ 4.)

While Pabey was preparing to take office, his financial consultant, James Bennett, analyzed the City's budget and concluded that the City was facing a serious budget crunch.  (DE 22-6 at 3.)  Acting on advice from Bennett, Pabey determined that the City would have to lay off some of its employees to help close the budget deficit.  (DE 22-8 at 15.)  Charles Pacurar, who was one of Pabey's close advisors during the campaign and was later appointed City Controller, was given the task of implementing most of the layoffs, in conjunction with human resources personnel.  (DE 22-8 at 18-19, 24-25; DE 22-9 at 2.)

---

[1]  Defendants also moved for summary judgment on Plaintiff's age discrimination claim, noting that Plaintiff's replacement, Aida Gonzalez, is six years older than Plaintiff.  (DE 22-21 at 3; DE 30 at 12.)  Plaintiff does not challenge this portion of the motion.  (Resp. at 2, n.1.)  Thus, summary judgment is granted with respect to Plaintiff's ADEA claim without further discussion.

**B.  Plaintiff's Termination**

Flame Austin-Ridle, an African-American woman, began working for the City of East

Chicago in 1975 as a part-time school crossing guard, but in the late 1990s, she became a "safety

supervisor" of the crossing guards.  (DE 30 at 4.)  In that role, she oversaw the crossing guards,

assigning them to their posts, scheduling substitutes, collecting time sheets, and making sure

they were where they were supposed to be.  (*Id*. at 4-5)  When someone called to complain about

a crossing guard, she would write up the complaint and report it to David Morris, the Public

Safety Manager, who was her supervisor.  (*Id*. at 4.)  The City's records indicate that Austin-

Ridle was paid a salary of $21,078.24 in 2004.  (DE 30-7 at 2.)

During the 2003-2004 mayoral campaigns, Austin-Ridle supported Pastrick.  She had

several bingo parties at her house for Pastrick, and she and her husband put signs up at their

house and on their cars.  (DE 30 at 7-8.)  She talked to people that she knew about supporting

Pastrick, but did not go door-to-door.  (*Id*.)  She believes that Pabey knew she supported Pastrick

because she saw Pabey in the neighborhood when he was campaigning, and he may have seen

her and observed her Pastrick yard signs at that time.  (*Id*.)  Yet also she testified that she met

Pabey only once a long time ago, and she does not think he knows her name or where she lives.

(*Id.* at 8.)  She has never met Pacurar, but believes that he was aware of her support for Pastrick

because he was Pabey's "right-hand man."  (*Id*.)  She also hypothesized that Pabey and Pacurar

learned that she supported Pastrick from her manager, David Morris, whom she says knew of her

support for Pastrick because she asked him for Pastrick signs.  (*Id*.)

On January 7, 2005, about a week after Pabey was sworn in as mayor, Austin-Ridle was

fired.  (DE 30-3 at 5.)  Austin-Ridle was one of dozens of employees who were laid off early on

in the Pabey administration in an effort reduce the size of the City's budget.  (DE 22-5 ¶¶ 14, 17,

23; DE 22-21 ¶ 5.)  Morris testified that Pabey called him and told him he was conducting a

reorganization, and asked whether Morris had an assistant working under him.  (DE 30-3 at 5.)

When Morris answered in the affirmative, Pabey told him to tell the assistant that she was being

terminated.  (*Id*.)  Pabey did not say anything about filling the position with someone else.  (*Id*.

at 6.)  However, Plaintiff testified that as she was leaving Morris's office on the day she was

fired, he asked for her beeper and her crossing guard schedules because "he said he was going to

need them for the next person."  (DE 30 at 9.)  Morris had no other contact with Pabey or

Pacurar regarding the firing.  (DE 30-3 at 5.)  He testified that he would not have fired Austin-

Ridle had he not been directed to do so.  (*Id*. at 10.)

Mayor Pabey testified at his deposition that he did not know who Austin-Ridle was.  (DE

26-4 at 11.)  Charles Pacurar knew that she had been a coordinator or supervisor of crossing

guards, but he did not have specific information about her termination.  (DE 27-3 at 7.)  He

stated that he only knew Plaintiff by name, and did not know her personally.  (*Id*.)

**C. Aida Gonzalez's Hiring**

As a Democratic precinct committeewoman for nearly twenty years,[2] Aida Gonzalez was

experienced in East Chicago politics.  (DE 30-4 at 10.)  Gonzalez, a Hispanic woman, was a

supporter of Pabey's mayoral campaign.  She went door-to-door among her neighbors, attending

campaign meetings and registering voters.  (*Id*. at 8-10.)  Some years prior to Pabey's election,

she told him that she would like to work in East Chicago, where she lived.  (*Id*. at 6.)  For many

---

[2] Mayor Pastrick removed her from the precinct committeeman position in 2003 or 2004,
replacing her with Michael Lopez, but she won a new four-year term in May 2006.  (DE 30-4 at
10.)

years she had been working as a bus driver in North Township.  (*Id*. at 4.)

Pabey admitted that at some point after he took office, he offered Gonzalez a job with the City.  (DE 26-4 at 11.)  But he testified that he merely offered her employment with the City, without offering a particular position.  (*Id*.)  Pacurar admitted that the mayor might have told him to find a position for Aida Gonzalez.  (DE 27-3 at 8.)  At some point, Pacurar called Gonzalez and told her that the position of crossing guard supervisor was open if she was interested, and she said yes.  (DE 30-4 at 6.)  But he testified that when he put Gonzalez in a position with the crossing guard unit, he did not know he was replacing Austin-Ridle, because he did not know what Austin-Ridle's title had been.  (DE 27-3 at 7.)

David Morris testified that in late March or early April 2005, roughly three months after Plaintiff was fired, Fred Vasquez in Human Resources called him and "advised me that I was getting an assistant, and he advised me that it was going to be Gonzalez."  (DE 30-3 at 6.)  Whereas under the Pastrick administration Morris had the authority to hire and fire his subordinates, he did not have that authority under the Pabey administration.  (*Id*. at 7-9.)  It appears that Gonzalez performs essentially the same functions as crossing guard supervisor that Plaintiff performed – monitoring the crossing guards, making their schedules, and tracking their absences.  (DE 30-4 at 7.)  Although the record does not provide Gonzalez's 2005 salary, she made $42,076.80 in 2006 – almost double what Austin-Ridle made in the same position.[3]  (DE 30-7 at 6.)  Between Pastrick's last year in office in 2004 and 2006, the salaries of administrators in the Crossing Guard Unit rose from a total of $96,486.45 to $118,794.08.  (*Id*. at 2, 6.)

---

[3] According to the 2006 records, Gonzalez's salary was almost identical to that of her supervisor, Morris.  Morris, the "Public Safety Manager," made $42,095.84 – $19.04 more on the year than Gonzalez, whose title was "Administrative Assistant."  (DE 30-7 at 6.)

In May 2005, Pacurar told Morris to cut his budget, so Morris terminated several crossing

guards according to their seniority.  (DE 30-3 at 7.)  All of the crossing guards who were laid off

in May were called back at the start of the 2005 school year, except for two whom Morris could

not reach.  (*Id*. at 8.)  Around that time, Human Resources also sent Morris three new crossing

guards.  (*Id*. at 8-9.)  Morris testified that he did not know why they were sent to him.  (*Id*.)  He

stated that three or four more crossing guards have been hired since the fall of 2005, and that he

played no role in their hiring.  (*Id*. at 9.)  At any given time there are 45 to 60 crossing guards.

(*Id*. at 10.)

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A genuine dispute about a material fact exists only "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a court construes "all facts and

reasonable inferences from the record in the light most favorable to [ ] the non-moving party."

*Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

### A. First Amendment Claim

The First Amendment protects public employees from suffering adverse job actions

because of their political beliefs and associations.  *Rutan v. Republican Party of Ill.*, 497 U.S. 62,

71 (1990); *Elrod v. Burns*, 427 U.S. 347, 359 (1976) ("The threat of dismissal for failure to

provide [political] support unquestionably inhibits protected belief and association, and dismissal

for failure to provide support only penalizes its exercise.").  Although an exception exists for

6

actions taken against "policymaking" or "confidential" employees, *see Carlson v. Gorecki*, 374

F.3d 461, 464 (7th Cir. 2004)*,* Defendants have not contended that Austin-Ridle, a crossing

guard supervisor, falls into that category.

In order to establish a *prima facie* case of politically motivated discharge, a plaintiff must

demonstrate that his conduct was constitutionally protected, and that the protected conduct was a

motivating factor in the decision to terminate him.  *See Nelms v. Modisett*, 153 F.3d 815, 818

(7th Cir. 1998).  The burden on the plaintiff is not insignificant; "[a] disgruntled employee fired

for legitimate reasons would not be able to satisfy his burden merely by showing that he carried

the political card of the opposition party or that he favored the defendant's opponent in the

election."  *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981).  If a plaintiff is able to

demonstrate that his political affiliation was a motivating factor in his termination, the burden

shifts to the defendant to show that he had a legitimate, non-political reason for terminating the

plaintiff.  *Nelms*, 153 F.3d at 818.

In this case, Plaintiff cannot demonstrate that her support for Mayor Pastrick was a

motivating factor in the decision to fire her.  "In order to prove that [an employer] was motivated

by his political associations, [the employee] must prove that [the employer] in fact knew of

them."  *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992) (citing *Cusson-Cobb v. O'Lessker*,

953 F.2d 1079 (7th Cir. 1992)).  Austin-Ridle's political support for Pastrick was relatively low-

profile; she held a few bingo fund raisers for him, had his signs in her yard, and talked to friends

and acquaintances about supporting him.  These are not the kinds of activities that would have

immediately made her known to the Pabey camp.  Indeed, Austin-Ridle does not dispute that

Pabey does not know her or know where she lives. Yet she suggested at her deposition that he

might know her political affiliation because she saw him campaigning in the neighborhood, and

7

at that time, he might have seen her yard signs.  It's difficult to see how Pabey would have known Austin-Ridle's political views when he didn't even know who she was.  Austin-Ridle also thinks Pacurar might know that she supported Pastrick because he is Pabey's "right-hand man" and Pabey might have shared that information with him.  But this is speculation piled on speculation.  No reasonable jury could conclude from these facts that Pabey fired her because she supported Pastrick.

In her response to summary judgment, Plaintiff initially agrees that "[a] public employee alleging [an] adverse employment action by reason of First Amendment protected conduct in his political activities must show that the conduct was a substantial or motivating factor in the employer's decision."  (Resp. at 6.)  But she later argues, without citation to any legal support, that "[i]t is no less a violation of the First Amendment . . . for Pabey to direct the firing of Austin-Ridle, even if he didn't know anything about her or her politics[,] to make room for a politico he wanted to take care of."  (Resp. 8.)  It is true that the First Amendment protects an employee not only from adverse actions based on the employee's support for the wrong party, but also from being treated differently because of one's apolitical attitude or one's lower level of political support relative to another employee.  *Roberts v. United States Jaycees*, 468 U.S. 609, 623 ("Freedom of association . . . plainly presupposes a freedom not to associate."); *Hall v. Babb*, 389 F.3d 758, 765 (7th Cir. 2004) ("We see nothing to distinguish patronage based on a relatively higher level of involvement within the same political party from patronage based more simply on membership alone in a particular party." (citation omitted)).

However, Plaintiff cannot very well prove that political motivation was a substantial factor in her firing without demonstrating that Defendants knew her politics.  Plaintiff "could be

8

fired for a good reason or for no reason at all, as long as [s]he was not fired because of [her] constitutionally protected activities." *Garrett*, 961 F.2d at 633.  Moreover, "[a] discharge is not *because* of the employee's political beliefs if the employee would have been discharged regardless of those beliefs, even if the reason he would have been discharged anyway, while nonpolitical, is thoroughly disreputable, such as nepotism." *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (citing *Byron v. Clay*, 867 F.2d 1049, 1051 (7th Cir. 1989) ("The First Amendment does not forbid nepotism.") (dictum)); *Tarpley v. Jeffers*, 96 F.3d 921, 929 (7th Cir. 1996) (even strong evidence of bias in preselection of applicants is insufficient in the absence of evidence that the bias or preselection was politically motivated rather than motivated by other sorts of favoritism).  Here, the evidence demonstrates that Pabey wanted Morris to terminate his assistant without regard to who that assistant was.  For all he knew, the person in that job might have voted for him.  Essentially, then, for Plaintiff's firing to have been politically motivated, Pabey would have had to have somehow surmised that whoever was in the crossing guard position must be, at a minimum, less of a political ally than Gonzalez, and therefore, that person was dispensable.  But again, there is no evidence to support such a theory.

To the contrary, the evidence demonstrates that there was no causal link between Gonzalez's hiring and Austin-Ridle's firing.  Three months elapsed between these two events; this cuts against the notion that Plaintiff was fired to make room for Gonzalez.  *See McClure v. Cywinski*, 686 F.2d 541, 546 (7th Cir. 1982) (fact that three and a half months passed between manager's comments about employee's political affiliation and employee's eventual termination "severely undercut[]" the probative value of those comments in demonstrating political motivation for the firing).  In addition, it was Pabey who was involved in eliminating Plaintiff's

9

position, but it was Pacurar who, three months later, placed Gonzalez in Plaintiff's old role at the

mayor's request that Pacurar find a place for her.  According to Pacurar, he did not even know

that it was Austin-Ridle's job he was filling when he put Gonzalez there.  Thus, there is no

evidence that these actions took place according to some master plan; instead, the evidence

suggests that Plaintiff's firing and Gonzalez's hiring occurred totally independently of one

another.

At most, Plaintiff can make the case that, during the time that the City was allegedly

experiencing a budget crisis, it hired one of the mayor's supporters at twice the salary it once

paid a long-time city employee to do the same job.  While this might raise some eyebrows, the

wisdom of the City's allocation of tax dollars to its payroll is a political issue for voters to

ponder, not a constitutional violation for this Court to redress.

**B. Race Discrimination Claim**

Austin-Ridle also claims that Defendants discriminated against her on the basis of race in

violation of Title VII and 42 U.S.C. § 1981.  Plaintiff has no direct evidence of racial

discrimination, so the Court employs the burden-shifting approach of *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).  *Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d

673, 682 (7th Cir. 2001) (plaintiff alleging race discrimination under Title VII and § 1981 can

prove his case through indirect method established in *McDonnell Douglas*).  Under that method,

a plaintiff may meet his burden of making out a *prima facie* case by proving that: 1) she was a

member of a protected class; 2) that she was performing her job according to her employer's

legitimate expectations; 3) that she was terminated; and 4) that other similarly situated

individuals not in the protected class were treated more favorably.  *Peters v. Renaissance Hotel*

*Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002).  If a plaintiff can demonstrate those elements, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for terminating the plaintiff.  *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006).  At that point, the burden shifts back to the plaintiff to demonstrate that the articulated reason is, in fact, a pretext for discrimination.  *Id.*

In this case, Plaintiff has met the first three elements of the *prima facie* case:  1) as an African-American, she is in a protected class; 2) there is no suggestion in the record that she was not performing her job satisfactorily, and her supervisor said he would not have fired her if he hadn't been told to do so; and 3) she was fired.  However, Plaintiff cannot demonstrate that other similarly situated individuals were treated more favorably than she was.  She has not pointed to a single individual to whom she ought to be compared.  Rather, in her cursory argument on this claim, she skips over the "similarly situated" element and goes directly to the issue of pretext, claiming that Defendants could not have fired her to reduce its budget because they proceeded to hire a replacement at twice her salary.  This is just a retread of her First Amendment argument.

Plaintiff cannot skip the "similarly situated" step.  *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) ("[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met.").  Without it, Plaintiff can only demonstrate that she is an African-American person who was fired even though she was doing a good job – but she cannot ground the reason for that firing in racial discrimination.  Thus, summary judgment is granted on this claim as well.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (DE 20) is

**GRANTED**; Defendants' Motion to Strike (DE 34) is **DENIED AS MOOT**.  The Clerk shall

treat this action as **TERMINATED**; all further settings in this action are hereby **VACATED**.

    **SO ORDERED**.

    ENTERED:  December 7, 2007

<div style="margin-left: 40%;">

s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT

</div>